O’Neall, J.
In considering this case, two questions present themselves : 1st, does the writ of certiorari lie ? 2d, upon the cause shewn ought it to be granted 1 Each of these general questions embrace and include several minor ones, which will be shewn and developed in the progress of the argument. Before, however, I enter upon the discussion of these topics, I *369 may bo permitted to say that the office’ of deciding between two bodies of rival and angry men, is not a desirable one.
It cannot be expected that any decision will giye entire satisfaction; and the feelings of disappointed parties naturally lead them to suppose that the tribunalwhich decides against them has not perceived the true merits of their case. When the former case was before this Court,* we supposed that it had decided all the questions of vital importance between the parties; that it gave discontent to the losing party, was no more than was anticipated ; that the questions decided by it should again, collaterally or directly, be drawn into discussion, was, however, no.t expected.
In permitting the argument, in this case, to trench upon the points discussed and decided in the former opinion, we have been desirous to satisfy, if possible, those against whom our .opinion has been, and Will again be, that they have not been denied by us every opportunity-of obtaining justice.
If they have been unable to obtain abstract justice, (according to their own notions,) it has been prevented by their own acts, done at a time when they were not looking forward to a law suit as either the corner stone of the Medical College, or the ploughshare which was to upturn its foundations.
1. The writ of certiorari is a common law remedy, to cor, rect the errors in law of inferior jurisdictions. It is true that it is a prerogative writ, issuing from the King’s Bench in England. But because it is a prerogative writ, is no reason why it should not lie here. It is a prerogative writ granted by the King as the source of all power, for the security of the subject. Here it may well be said to appertain to the people in their judicial sovereignty, as one of the means which they have provided to check their limited jurisdictions in the exercise of the powers committed to them. That it has not been often resorted to, is no argument against its existence. As a common law writ, its disuse would not destroy the right to issue it. It must be taken away by act of the Legislature, or it must exist wherever its parent, the common law, exists. In addition to the instance of its-known use in this State, in Mary Hunting-don’s case, 1 Con. Rep. by Tread. 325, I recollect that the writ oí .certiorari was granted by the late Judge Nott, in 1813, at Newberry, on the application of George Gibson, to correct the errors in law of a Court p,f justices' and freeholders, who hadj under the landlord’s and lessor’s act of 181-2, pronounced' judgement of ouster against the said Gibson, on proof of holding over after the notice to quit under the act, under a parol lease from John Sterling.
The ceHiorari is not, however, as was supposed, a substi, *370 tute for an appeal; it office is not to correct errors in fact, but in law. It is the means of correcting the abuse of an inferior jurisdiction. In the case of Rex v. The Inhabitants of Clare county of Glamorgan, Burr. 2456, the Court, speaking the grant of a certiorari. say, “ the true distinction is, that where the prosecutor moves for it, it goes of course; but the defendant must shew a special ground to obtain it, or to remove the record back again by procedendo.”
I know of no case in this State, in which a certiorari would lie at the instance of the prosecutor; if there is any, the distinction between him and the defendant, spoken of in the authority cited, does not exist. The writ can in no case be granted only on cause shewn. The practice has, so far as I am informed, been that pursued by the judge below: in the first instance to grant a rule, and upon its return to grant or refuse the certiorari, according to the case made by the affidavits filed on both sides.
In England, it is perfectly clear that a writ of certiorari can only be granted in open Court, in Term time, 2 T. R. 89. The samo rule must prevail here, for in the act “ to give to the judges of the Court of Sessions and of Common Pleas, the same authority to grant writs, and hear and determine motions at Chambers, as they now have in open Court, and for other purposes therein mentioned,” the writ of certiorari is not one of the writs enumerated and provided for. The writ, in this case, was applied for in open Court in Term time, as well as at Chambers in-vacation: so that this part of the case has been noticed more for the sake of stating a rule of practice^than any effect it is to have on the decision.
It is contended that without looking to the cause shewn, the writ ought riot to be granted: 1st, because the acts of the Legislature have made the decision of the magistrates and freeholders conclusive between the parties; and 2d, that the writ cannot be granted after a trial and judgement of the inferior jurisdiction.
The statutes of 5 R. 2 St. 1, c. 8, appendix to the L. P. p. 5; 15 R. 2, c. 2, P. L. 37, 21 J. 1 c. 15, are the English statutes on the subject of forcible entry and detainer, which seem to be of force here. Under them and the act of 1829, the Court which decided this case was convened. The 17th section of the act of 1829, (acts, p. 30,) for the regulation of magistrates in the parishes of St. Philip’s and St. Michael’s, provides, “ that the forms and proceedings before magistrates in cases of forcible entry and detainer, shall hereafter be the same as are prescribed by law, in cases where tenants hold over after the expiration of their leases.” The law referred to, to regulate the forms and other proceedings, among other provisions, declares that “ the judgement shall be final and conclusive to *371 the parties, in respect to the facts to be decided by it. ” Acts of 1812, p. 40. From this provision it is manifest that the judgement is only to be conclusive of the facts; and that as to error in law, the judgement may for that cause be impeached. That the first objection raised on this provision of the act, as well as the second, that a writ of certiorari will not lie after trial and judgement, is untenable, is apparent from the case of Rex v. Morely et al. Burr. 1040, In that case the defendants were convicted by a justice under the Conventicle act, 22 Car. 2, c. 1. They appealed to the sessions, verdict and judgement against them. The motion was for a certiorari. In the 6th section of the Coventicle act it is provided, “ that no Court whatever shall intermeddle with any cause or causes of appeal on.this act: but they shall be fully determined in the Quarter Sessions only.” Under the 13th section it is enacted “ that, the act shall be construed most largely and beneficially, for the suppression of conventicles, &c. and that no'.fecord, warrant or mittimus, to be made by virtue of this act, or any proceedings thereupon, shall be reversed, avoided, or in any way impeached by reason of any default in form.” The Court unanimously granted the certiorari, observing that, “A certiorari does not go to try the merits of the question, Tout to see whether the limited .jurisdiction have exceeded their bounds. The-jurisdiction of that Co/urt is not taken away, unless there be express words to take it away.”
On looking into the parts of the conventicle act cited, it will be seen, that the words used’are much stronger to oust the Court , of power, to correct the errors of the inferior jurisdiction, than they are under the acts of 1829 and 1812, under which the Court of magistrates and freeholders proceeded in this case. Yet the Court held that the writ-of certiorari would lie.
So too in the case of Rex v. Morley et all there had not only been a conviction, but on appeal a verdict and judgement in'.the Quarter Sessions; thus fixing the principle that.even after judgement the writ of certiorari may be granted. I am hence satisfied, that if the cause shewn be sufficient, the writ of certiorari might be granted in this case. . It remains to exa«. mine this part of it.
2. The former opinion, it appeared to me, decided, in a great degree, the question of title to the College building.and lot, as between the Society and the Faculty.* So soon as it was ascertained that the professors were to be regarded as the officers of the Medical Society in all their acts in relation to the Medical College, it would seem to be tolerably plain that they could have acquired in the buildings which were erected by the funds of the City Council and the State for the use of *372 the Medical College, no rights adverse to those to whom they were indebted for all their rights and privileges as professors.
But an examination is due to this part of the case, both from the zeal and ability with which the rights of the professors, as individuals, have been pressed upon us ; and also from the importance of the interests at stake.
In forcible entry and detainer two main questions are presented : 1st. As to the fact of possession 1 and 2d. As to the force with which the entry has been made, or the possession detained ? Incidental to the first question, the title, whether in fee or for years, is necessary to be found under the statutes, to entitle the prosecutor to the writ of restitution.
in this case there seems to be no doubt upon the question of force : the possession of the premises was detained by Senft, an armed tenant, by the command of Dr. Prioleau, who, on being applied to for possessioti, said to the newly appointed janitor, that if Dr. Porcher, the President of the Medical Society, wanted the building, he must fight ; and that the man who went there to take possession would be shot. 1 Russell on Crimes, 417.
It will only be necessary, therefore, to examine whether any error in law has been committed by the justices and freeholders, in finding the facts of possession and title for years m the Medical Society. These two facts are so intimately connected, and are so much blended, that most of the remarks which apply to the fact of possession will apply to that of the title.
One leading circumstance which will point us to the true solution, is the fact that no individual or private right of possession or property was intended to be conferred by the City Council or the State, upon the members of the Faculty. In all the grants to them they were for the use of an institution in being, and to be applied by them as its officers for the time being. The derivative character in which all the appropriations or donations are made to them, negatives any private interests, and shows that the College, not its officers, were to be benefited. It was shewn in the former opinion that the Medical College was a part of the Medical Society, considered as a corporation. On this occasion I think it is demonstrable that a gift to the College, or for the use of the College when it was so applied, vested in the Medical Society. Every office belonging to the Medical College was created, and might be abolished, by the Medical Society: every professor was appointed, and might bo removed, by the Medical Society. These plain facts to ordinary minds would seem to be enough to establish the entire dependence of the officers on the Society, and that, in whatever was placed in their hands to be applied to the use of the College, and which they did so apply, they could have *373 ' no legal rights. It vested in the head or corporation to whom the College belonged.
But it is again urged that the professors, as individuals,founded the College, and not the Medical Society. I confess that after much reflection on this part'of the case, I have never been able to see the least room to. doubt that the professors could claim no such legal character. . I said before that they were the agents of the Society, to “ endow the Medical College.” This I still think to be true. I did not then nor do I now suppose, that they were out of their own private purses or fortunes to build up the Medical College. But I think that the matriculation and graduation fees, which are, strictly speaking, paid for academic privileges, and which were therefore a fund springing from the institution, all donations to the College, or to the Faculty for the use of it, are properly to be regarded as endowments obtained by the agent of the Society. Let us look in the first place to the matriculation and graduation foes. Are they the individual or private property of the professors 1 The fees for each professor’s ticket of admission to his lectures belong to himself. But the matriculation and graduation fees belong to the institution. They are paid for that which no individual member of the Faculty could grant, and which in this particular instance could only be completed and finally granted by the Society in conferring degrees. How can the professors pretend that they have any individual or private rights in this fund ? It is true that they have been the means why it has amounted to so large a sum. But it does not follow that therefore they had any rights in it. They had.no more right to it than the Faculty of the South Carolina College have to the tuition fund, which proceeds from their labors, and is increased or diminished by their characters for talents and usefulness, or their want of character in either or both of these respects. But it never was supposed that they had any right to it; for they are otherwise paid fpr their services. So too the professors of the Medical College are paid for their services by the fees paid for their respective tickets of admission to their lectures. In the organization of the College, the Faculty and Trustees agreed upon the report-of the Faculty of the 29th of April, 1824, that “the fees of matriculation and graduation shall constitute a common fund for defraying the contingent expenses of the institution.” This shews that at this early day this fund was looked at not as the result of private enterprise, and therefore to be appropriated to private benefit, but as the fruits of the institution, and to be appropriated to its benefit.
In connection with and antecedent to the consideration of the appropriation of $15,000 made by the City Council, to be “ applied to the erection of a building for the use of the said *374 it will be necessary to consider the objection urged, that the professors, as individuals, gave their bond for the performance of the conditions on which the appropriation was made, and hence that it was a gift to them as individuals. The execution of the bond to the City Council, in the manner in which it was ultimately executed, arose from the legal opinion of the able gentleman who then filled the office of Recorder of the City, that any bond executed by them, as a Faculty of the Medical College, would be void, as they had no corporate existence as such. This was true, and to obviate this objection, the bond was executed by them as individuals, not to obtain the money to enable them to build a Medical College of their own, but for the use of an existing institution, the Medical College or Medical School. It was not supposed on the former occasion, that this bond executed • by the professors could have any legal obligation as the deed of the' Medical Society, or of the successors of the professors. But it was then supposed, and 1 see no reason to doubt the correctness of the supposition, that the Medical Society, from the use of the building, as the Medical College in which they conferred their degrees, would liave been held to have assented to the conditions annexed to the appropriation by the City Council, and which the profes.sors individually bound themselves to perform, and that the Society would have been legally bound, (though not by deed) to the performance of the said conditions. But whether the Society be bound or not, is not necessary to be discussed : the fact that the professors gave such a bond does not make the appropriation of the City Council either the price paid to them for services to be rendered by them- according to the bonds, or a donation to them as individuals. For the appropriation of $15,000 by the City Council, and the use of a lot of land, were not granted to the Faculty as individuals, but as the officers of a known and existing institution, and fo-r its use. ■ T ake the words of the report of the committee of ways and means, of the 6th of May, 1825, as being more favorable to the professors than that which preceded it of the 20th of April. Speaking of the $15,000, they say, “which when received, shall be appropriated to the use of the Medical Faculty, subject to their draft, as the progress of the work or the purchase of materials may from time to time require; and solely applicable- to the erection of a suitable building as a Medical School, to be located on the most convenient vacant spot on the lot owned by the City, connected with the Marine Hospital.” Taking all the words used in this report together, there is no difficulty in ascertaining what was intended; a part of the Marine Hospital lot was set apart as a site upon which a building was to be erected as a Medical School, by the fund of $15,000, which *375 was to be applied to that purpose by the professors of the Medical School, called in the report the Medical Faculty. When they had completed the building they had no right of property ; they, as professors, had the right to use it for the purposes of the lectures, the authority to deliver which had been conferred upon them by the Medical Society; their title to possession was the title of those under whom, and by whose authority, they carried on the School or College.
The appropriations made by the State were for the “ Medical College,” to be drawn by or paid to the order of the Faculty. Here the persons composing the Faculty were the agents of the State to apply the sums of money appropriated, not for their own private use, but for the use of an already existing institution, the “Medical College.” When they had made the application, by expending the fund on the building, or any other purposes of the institution, they had nothing further to do with it. They are not trustees having a legal estate in the thing — every legal act which they were to do has been completed in building the College building. When built, it was not their building — it belonged to the institution of which the Medical Society was the head and corporation, and of which they (the gentlemen composing the Faculty) were then, but have unfortunately since ceased to be, the professors. It follows, that they have no legal rights in the College building and lot. It may be illustrated perhaps more plainly, by supposing that a grant of money was made by any benevolent person to the Faculty of the South Carolina College, to be by them expended in erecting a building as an observatory for the use of the College, upon a lot belonging to the donor, adjoining to the College square. After the Faculty had executed the purposes of the donation, by erecting the building, and had opened it to the use of the professor of astronomy, could it be pretended that they had any private legal right to it ? Unquestionably the legal right to the possession is in the corporation of the College; and the professor of astronomy, as the officer of the corporation, has the possession in fact. This is precisely the case with the Medical College building and lot; the building was erected for, and the lot dedicated to, the Medical School, then and more commonly since known as the Medical College: and hence it follows, that the title to the possession, whatever it may be, is in the corporation — the Medical Society. But the rights of the latter do not altogether rest on the legal effect of the different endowments — the Society had in fact the aclnal possession. In the building and on the lot, they annually met, and exercised for nearly eight years the academic power of conferring degrees. What was this but a possession in fact 1 Was it not as much an act of possession, as that of a professor. *376 who daily, during the session, entered the College, and delivered his lectures ? To me it seems that it is ; and that its legal effect is the same as that of the occasional visits of the owner t0 jj¡s plantation ; while there all his agents are subor-^biate to him — and when absent, although they have all his powers, yet the possession is his.
During this period of eight years, but after all the endow, ments had been obtained, and the College built, one of the Professors resigned. Did the faculty appoint his successor? No! he was appointed by the Medical Society. Did the Faculty say you shall not lecture in our house? No! Although lie was not the man of their choice, he entered upon the duties of his chair, delivered his lectures in the building, and is now associated with them in their newly organized College. This fact shews conclusively, that the right of possession was in the Society, and that, by their appointment, the prof essors held the possession in fact.
If the Professors, as Individuals, had the legal right of possession, they could have, at any moment they pleased, defeated the object of the grant from the City Council, of the use of the lot, and of the appropriations made by the City and the State. By closing the doors of the Medical College building against the Medical Society, at any time prior to the act of 1832, the College would have been ended. For no body of men, save the Society, then had the power to confer degrees ; and if this power was cut off from the lectures, their school was a private institution, conferring no academic privileges, and it would instantaneously cease to be a Medical College. ..-.It will not do to attempt to escape from this difficul-fypjow, by saying “we remedied this defect in our title by the act of 1832.'” The enquiry is, to whom did the right of posses-sipn belong before that act was passed ? If it belonged to the Faculty, then it goes to the new Corporation under that act; but if it belonged to the Medical Society, it can neither be, transferred by the act of 1832, creating a new corporation, nor by the Professors’ disclaimer of the Medical Society, as their head. We have seen that, up to the act of 1832, no ■persons, or body of men, could confer medical degrees in this State, except the Medical Society ; and that the existence of this power made a school of medicine a Medical College. It hence follows, from all these circumstances, to which I have adverted, that the Medical Society, and not the members of the Faculty, (appointed by them and to be removed by them) have the legal right to the possession of the building and lot of the Medical College.
But, as I said in the former opinion, the Medical Society •created the College, and this constitutes a legal foundation. *377 For they established and gave it laws, trusting first to its academic fees, and afterwards to future doilations, as its endowments. That all after donations were in aid of the original foundation and were subject to the rules of the founder, the Medical Society, unless otherwise specially 'directed by the donor, is fully proved by the case of Green v. Rutherforth, 1 Ves. Sen. 462. At page 472 the Lord Chancellor (Haftlwicke) says: “I agree in general, that if a subsequent donor gives the legal estate, or in trust, for the College, without a declaration of á special trust, it will fall under the power of the géñer'ál visitor to judge of the legal property in brie cas'e, or the equitable in the other, because by giving in trust for the College generally; and neither creating a distinct visitor hor a special trust, this donor has, by plain implication; intended that it should fall under the general statutes and rules of the College, and he regulated with the rest of their properly, although in the latter case, indeed, a bill must be in equity tó compel the Trustees; if they refused." Ffom what has already been said; it is apparent that all the donations were for the College; and if there ever ivas a legal trust in the Faculty, they executed it by applying the funds granted for the erection of the College building, to the purpose which w;as intended. It hence follows, that all comes in on the original foundation, and is to be regulated exactly as the professors and all concerned conceded that the Medical Society had and did exercise the right before ány dispute originated about it. In other words the possession in fact, by the Faculty, is that of the Medical Society,- and the latter, not the former, have the right to govern the College; and tcLsav who shall occupy its building as professors and lect case of the People v. Runkle, 8 J. R. 363, and decisive of the question of possession. Trustees of a church, having the right of garded as constructively in possession, by to the use intended : arid it was held that the of the congregation, who were denied the church by the Corporation, were guilty of and detainer, in forcing it open and using it. the forcible retention of possession by Senfl; and unsiSMTiwier the Society had taken from the Faculty the power of appointing a Janitor, and had appointed Egan to that office, who demanded possession, was a forcible detainer against the right of possession in the Medical Society. I have not adverted to the fact, that the Faculty were in possession more than three years. The possession, to bar an inquisition of forcible entry and detainer, must be in an adverse right to the prosecutor. In this case, that cannot be pretended. Their pos, session, as I have said before, and here repeat, was that of *378 the Medical Society. Under such circumstances, if they had been in possession fifty years, they could have acquired no right hostile to that of the Society.
The last subject which I shall notice, and that very briefly, is the question whether any title passed out of the City Council to the Medical College, or Society, to the lot of land on which the College building is situated. It is true that a corporation can only convey under seal, and in its corporate character. But the Faculty, who were in possession for the Medical Society, could not set up the defect of title arising from the fact that no legal conveyance had been executed by the City Council. They had the possession under a contract that the Medical College building and lot should be held and used by the Medical College for twenty years, on the terms which were stipulated in the bond of the Professors- in 1825. A possession of more than seven years of this time had been had by the Professors and Society, for the purposes of lectures- and degrees : the professors cannot now be allowed to alledge against the Society, by whose authority they delivered lectures, and had possession of the building for that purpose, that the Society had not a good title to the remaining thirteen years of the term.
As to the forcible detainer of possession from the Medical Society by the defendants, possession and title for a term of years in the Medical Society, there is no error of law in the inquisition, and hence the writ of restitutution of possession was properly granted by the Magistrates — and the writ of certiorari denied by the judge below.
The motion to reverse the decision is dismissed.
Johnson, J. concurred.
*379 CASES AT LAW, ARGUED AND DETERMINED IN THE COURT OF APPEALS OF SOUTH CAROLINA 5 AT COLUMBIA, MAY and JUNE, 1834. JUDGES PRESENT. HON. DAVID JOHNSON, Presiding Judge. HON. J. B.O’NEALL. HON. WM. HARPER.

 Quo warranto, (not reported) in which it was held-that the Medical College .was ? jmrt of the corporation of the Medical Society.